**STATE OF NORTH CAROLINA, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Appalachian Power Company et al., Intervenors.**

**No. 74–1941.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1975.

Decided March 24, 1976.

---

Millard R. Rich, Jr., Asst. Atty. Gen. of State of N. C., Raleigh, N. C., Norman B. Smith, Greensboro, N. C., and Thomas J. Schoenbaum, Chapel Hill, N. C., with whom Rufus L. Edmisten, Atty. Gen. of State of N. C., Raleigh, N. C., was on the brief for petitioner.

Steven A. Taube, Atty., F.P.C., Washington, D. C., with whom Drexel D. Journey, Gen. Counsel and John R. Staffier, Atty., F.P.C., Washington, D. C., were on the brief for respondent. George W. McHenry, Jr., Sol., F.P.C., Washington, D. C., at the time the record was filed also entered an appearance for respondent. Alan Abbot Tuttle, Sol., F.P.C., Washington, D. C., entered an appearance for respondent.

William J. Madden, Jr., Washington, D. C., with whom Donald K. Danker, Washington, D. C., was on the brief for intervenor Appalachian Power Co.

James E. Ryan, Jr., Asst. Atty. Gen. of Com. of Va., Richmond, Va., for intervenor Com. of Va. Anthony F. Troy, Richmond, Va., also entered an appearance for intervenor Com. of Va.

Frank M. Ellison, Deputy Atty. Gen. for State of W. Va., Charleston, W. Va., was on the brief for intervenor State of W. Va. Nicholas W. Johnson, Deputy Atty. Gen., W. Va., also entered an appearance for intervenor State of W. Va.

Edmund I. Adams, Sparta, N. C., filed a brief on behalf of the Committee for New River et al. as amici curiae urging reversal.

Dan R. Murray, Sparta, N. C., filed a brief on behalf of the Committee for the Improvement of Alleghany et al. as amici curiae urging affirmance.

Frederick E. Miller, Jr., Washington, D. C., filed a motion on behalf of W. Va. Division of the Izaak Walton League et al. for leave to file a brief as amici curiae and the brief was filed.

Before BAZELON, Chief Judge, and ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This is a petition by the State of North Carolina to review an order of the Federal Power Commission, granting the Appalachian Power Company a license to build a hydroelectric project on the New River.

The New or New-Kanawha River rises in the Appalachian Mountains of North Carolina and Tennessee and flows north through southwestern Virginia and into West Virginia where it becomes part of the main channel of the Kanawha River. In 1962 Appalachian Power Company (Appalachian) sought and received permission from the Federal Power Commission to study the

river as a potential site for a hydroelectric dam. On the basis of this study, Appalachian in 1965 applied to the FPC for a license to build a dam, to be known as the Blue Ridge Project, on that part of the New River located in North Carolina and Virginia. Hearings on the application commenced in May 1967 and continued for two years.

In October 1969 the Administrative Law Judge (ALJ) rendered a decision recommending the issuance of a license for the Blue Ridge Project. The Project was to include a 650,000 acre-foot water storage capacity, the stored water to be used for downstream water quality control. The states of North Carolina and Virginia generally supported the project, but objected to the ALJ's recommendation that drawdowns up to twelve feet in the level of the reservoir be permitted at certain times of the year. North Carolina also objected to the use of stored water for downstream pollution dilution.

The Commission ordered further hearings before the ALJ on the issues raised by the objections of North Carolina and Virginia. After the hearings the ALJ issued a "Supplemental Initial Decision" recommending the limitation of drawdowns to ten feet and reducing the size of the releases permitted for downstream pollution dilution. North Carolina and Virginia repeated their objections to the size of the permissible drawdowns and North Carolina once again objected to the inclusion of any storage capacity for downstream pollution control. The two states sought and were granted permission to argue before the Commission on their objections to the Supplemental Initial Decision.

While the case was pending before the Commission the decision came down in *Greene County Planning Board v. FPC,* 455 F.2d 412 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). Under that decision the FPC is required by the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.,* to prepare an environmental impact statement in advance of hearings on a proposed project so that the statement may be scrutinized in the course of the hearing. The FPC accordingly remanded the Blue Ridge proposal to the ALJ for further hearings, to afford an opportunity for cross-examination on the impact statement. Prior to these hearings the State of North Carolina withdrew its support of the Blue Ridge Project, citing potential adverse impact upon the land and way of life of the people in the area near the proposed dam.

North Carolina participated in the hearings on the impact statement and filed briefs which concerned themselves primarily with the adequacy of the statement's discussion of the social and economic effects of the project. In January 1974 the ALJ issued a decision finding the impact statement adequate and recommending the issuance of the license. On June 14, 1974 the FPC, in its Opinion No. 698, approved the Final Decision of the ALJ and issued a license for the Blue Ridge Project. The FPC postponed the effective date of the license in view of pending legislation which would have designated the New River as a wild and scenic river under the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.* The proposed legislation was not enacted by Congress.

On July 15, 1974 North Carolina and others petitioned the FPC for a rehearing on its opinion granting the license, citing several alleged errors in the opinion and in the FPC's consideration of the Project. The FPC on August 12, 1974 denied the petition for rehearing. North Carolina then filed this petition for review.

■ Section 313(b) of the Federal Power Act, 16 U.S.C § 825*l*(b), provides that any party aggrieved by an order of the FPC may seek review in this court. The statute further provides, however, that no objection to an order of the FPC may be considered on review unless the same objection was first raised in an application for rehearing directed to the FPC. As the Supreme Court has stated, it is the purpose of this provision to give the FPC notice of its alleged errors so that it may have the opportunity to correct them. *FPC v. Colorado*

*Interstate Gas Co.,* 348 U.S. 492, 500, 75 S.Ct. 467, 472, 99 L.Ed. 583, 593 (1955).

In its petition for review in this court North Carolina raised the following issues:

(1) whether the FPC failed to consider the alternative of energy conservation;

(2) whether the FPC had authorized inclusion in the project of water storage capacity for pollution dilution;

(3) whether the FPC failed to analyze adequately certain costs of the Project;

(4) whether the FPC failed to consider as an alternative to the Project the possibility that the river should be made a component of the National Wild and Scenic Rivers System.

North Carolina suggests that each of these arguments was raised with the necessary specificity in the petitions for rehearing directed to the FPC. We disagree.

The specific issue of water storage for pollution dilution is not foreshadowed by the evidentiary objection to Finding of Fact 18 which states that the Project will provide benefits such as flood control, low flow augmentation, recreational development, fishing opportunities and water supply. Neither are the references to the petitions of Alleghany and Ashe Counties sufficient. Those petitions only question whether the original smaller Project should have been reconsidered. No reference is made in them to the allegedly illegal inclusion of water storage for pollution dilution.

Similarly, Paragraph 4 of North Carolina's petition for rehearing simply attacks, in general terms, five of the Commission's findings of fact. These findings state that the Project will provide desirable public benefits, will enhance the aesthetic values of the area and that the Commission complied with the provisions of the National Environmental Policy Act in the licensing proceedings. The National Wild and Scenic Rivers Act is not mentioned. Neither is the Act mentioned in the petition of Ashe and Alleghany Counties. The portions of the petition cited to us by North Carolina, while containing a reference to the pendency in Congress of legislation pursuant to the Act, do not state that the Commission failed to consider designation of the New River as an alternative to the Project.

North Carolina contends that three of the specific issues raised in its argument concerning consideration of costs and benefits of the Project were also raised in the petitions for rehearing. These issues are (1) the purported consideration of the gross benefits rather than the net benefits of the Project; (2) the loss of natural stream flow due to the Project; and (3) the cost of electricity to pump water from the lower reservoir to the upper reservoir. None of these issues was specifically discussed in the petitions for rehearing.

North Carolina purports to have raised the "gross benefits" issue in portions of its petition that deal with whether the Project will be beneficial on balance. The cited part of the Ashe and Alleghany Counties petition contains only a general discussion of the need for the Project. The "loss of natural stream flow" issue is said to have been raised in the same parts of the petitions in which the Wild and Scenic River alternative was raised. A reading of those passages referred to shows that no such specific matter is raised. The same is true of North Carolina's argument concerning the cost of water pumping. This issue is said to be subsumed in the discussion of energy conservation as an alternative to the Project, but it is not mentioned there. We think that section 313(b) of the Federal Power Act requires something more concrete and specific than the vague references cited to us by North Carolina.

We think two issues were raised in the petitions for rehearing with the degree of specificity necessary to call the FPC's attention to them or "stimulate [its] consideration of" them. *Indiana & Michigan Electric Co. v. FPC,* 163 U.S.App.D.C. 334, 337, 502 F.2d 336, 339 (1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). The two issues are (1) the FPC's alleged failure to consider energy conserva-

tion measures as an alternative to the Project and (2) the FPC's alleged failure to give adequate consideration to one of the social costs of the Project, specifically the relocation of persons displaced by the Project. We conclude however that North Carolina's contention that these issues were not adequately considered by the Commission is without merit.

Section 102(2)(D) of the National Environmental Policy Act of 1969, 42 U.S.C § 4332(2)(D) requires all agencies of the federal government to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." North Carolina argues that the FPC failed to comply with this requirement of the Act in that it failed to consider whether the adoption of energy conservation measures such as reduced consumption and "peak pricing" would make unnecessary the power to be supplied by the Blue Ridge Project. The argument does not persuade us. The Commission staff's final environmental impact statement makes it clear that the FPC did consider this alternative. The statement notes:

> Even if all U.S. consumers were to adopt stringent conservation practices with respect to electricity, the demand for electric power would continue to increase to such an extent that all of the production of Blue Ridge would be essential and, in fact, would meet only a small part of the foreseen future need.

■ The Commission again discusses the matter of energy conservation in its Opinion No. 698–A, denying North Carolina's application for rehearing. Opinion No. 698–A contains a thorough discussion of the impact of energy conservation on the nation's energy needs in general and on the need for the Blue Ridge Project in particular. The discussion makes it clear that the consideration of the energy conservation alternative is sufficient under the standard established by this court in *Natural Resources Defense Council v. Morton*, 148 U.S. App.D.C. 5, 458 F.2d 827 (1972):

We reiterate that the discussion of environmental effects of alternatives need not be exhaustive. What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned.

\* \* \* \* \* \*

> . . . the requirement in NEPA of discussion as to reasonable alternatives does not require "crystal ball" inquiry. . . . *The statute must be construed in the light of reason* if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite. [Emphasis supplied]

*Id.* at 14–15, 458 F.2d at 836–37.

A relatively brief discussion of an issue might not always be sufficient to satisfy the "rule of reason" test laid down in *Natural Resources Defense Council v. Morton, supra.* In the present case, however, the parties raised only the most generalized concern about "conservation of energy" in their petitions for rehearing and never specifically brought such matters as "peak load pricing" to the Commission's attention. In these circumstances the discussion of these issues by the Commission is sufficient.

■ North Carolina's second argument is that the FPC's analysis of the costs and benefits of the Blue Ridge Project is inadequate to show that the benefits exceed the costs. The specific issue that North Carolina is permitted by section 313(b) of the Federal Power Act, 16 U.S.C § 825*l*(b), to raise in this regard relates to the relocation of persons who will be dispossessed by the creation of the reservoirs adjacent to the Blue Ridge Dam. North Carolina argues that the proviso attached to Appalachian's license by the Commission does not guarantee that replacement housing will be provided.

The question here is not whether the FPC may require guarantees of replacement housing; rather the question is whether the FPC adequately considered the projected social cost of the project. We think it clear

that the Commission did consider it thoroughly. The Final Environmental Impact Statement contains precise data concerning the numbers of persons to be dispossessed; and recognizing the problem the FPC specifically provided in the license that Appalachian would carry the burden of assisting in relocation under the continuing scrutiny of the FPC and pursuant to the recommendations of the Department of Housing and Urban Development. Thus the license provides:

*Article 55.* The Licensee shall establish a relocation advisory service and give reasonable financial assistance to assist in the relocation of persons now located in the project area and to minimize any hardship to such persons arising from such relocation and, within six months of the effective date of the license and annually thereafter during the construction of the project, shall report to the Commission on the success of its efforts. The provision of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 shall be used as a guide to implement this article.

 The Wild and Scenic Rivers Act provides two methods by which a river may be included in the national wild and scenic rivers system: (1) by Act of Congress, section 2(a)(i), 16 U.S.C § 1273(a)(i) and (2) by designation by the legislature of the state

through which the river flows followed by determination by the Secretary of the Interior, upon application of the governor of the state, that the river meets the criteria established by the Act, section 2(a)(ii), 16 U.S.C § 1273(a)(ii). Rivers designated by the state are to be administered by the state without expense to the United States. In section 3, 16 U.S.C § 1274, Congress itself designates ten rivers as components of the system; and in section 5(a), 16 U.S.C § 1276(a), Congress designates certain additional rivers "for potential addition" to the system. Section 4, 16 U.S.C § 1275, directs the Secretary to study and the President to submit to the Congress no later than October 2, 1978 reports on the suitability for addition to the system of the rivers designated in section 1276(a) as potential additions.

Pursuant to 16 U.S.C § 1273(a)(ii), following designation of the New River by the state legislature, the Governor of North Carolina recommended to the Secretary of the Interior on December 12, 1974 that the river be included in the national wild and scenic rivers system. The petitioners contend that section 1278(b) of the Act prohibits the Commission from licensing the New Blue Ridge Project while the state's recommendation is being considered by the Secretary of the Interior.[1] We are unable to agree.

---

1. The pertinent part of 16 U.S.C § 1278(b) is:

§ 1278. Restrictions on water resources projects.

\* \* \* \* \* \*

(b) Construction projects on rivers designated for potential addition to the system.
The Federal Power Commission shall not license the construction of any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act, as amended, on or directly affecting any river which is listed in section 1276(a) of this title, and no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river might be designated, as determined by the Secretary responsible for its study or approval—
(i) during the ten-year period following October 2, 1968, or for a three complete fiscal

year period following any Act of Congress designating any river for potential addition to the national wild and scenic rivers system, whichever is later, unless, prior to the expiration of the relevant period, the Secretary of the Interior and, where national forest lands are involved, the Secretary of Agriculture, on the basis of study, determine that such river should not be included in the national wild and scenic rivers system and notify the Committees on Interior and Insular Affairs of the United States Congress, in writing, including a copy of the study upon which the determination was made, at least one hundred and eighty days while Congress is in session prior to publishing notice to that effect in the Federal Register: *Provided,* That if any Act designating any river or rivers for potential addition to the national wild and scenic rivers system provides a period for the study or studies which exceeds such three complete fiscal year period the period provided for in

The pertinent part of section 1278(b), i. e. section 1278(b)(i) and (b)(ii) comprises one sentence of 384 words. The syntax is poor, the language is confusing and at first glance may seem inexplicable. Careful analysis however discloses the sense of the verbiage. The entire sentence relates to those rivers "listed in section 1276(a)" as potential additions to the system. For a ten-year period following October 2, 1968 the Federal Power Commission is forbidden to license the construction of any dam on such a designated river unless the Secretary has determined that it should not be included in the system. If the Secretary reports to the Congress his recommendations concerning any river designated as a potential addition to the system, an additional period of three years, beyond that specified, is allowed for congressional consideration of the report. If a state, proceeding under section 1273(a)(ii), recommends to the Secretary that any river designated as a potential addition by section 1276(a) be included, then the additional period allowed for action by the Secretary is one year.

The New River is not one of those designated by Congress in 16 U.S.C § 1274 as a component of the wild and scenic rivers system. That section therefore offers no comfort to the petitioners. Moreover the New River is not designated by 16 U.S.C § 1276(a) as a potential addition to the system. Since in our view section 1278(b) applies to only those rivers designated by section 1276(a) it follows that section 1278(b) does not prohibit the licensing of the New River project.[2]

After the briefs were filed in this case North Carolina filed in this court a motion for leave to adduce additional evidence. The motion represents that information to which North Carolina and the FPC were previously denied access, but which was in the possession of Appalachian, indicates that the New River Valley is an archaeological site of great significance. North Carolina urges that complete research, excavation and salvage work should be undertaken and completed prior to the inundation of the valley. Appalachian apparently concedes that two or three years work will be required to complete the archaeological excavation and salvage but states that sufficient time will be available to complete the work if the license is made effective immediately. Accordingly, whether it chooses to make the license effective immediately or not, the FPC will modify the license to require that Appalachian provide the necessary time and funding for complete research, excavation and salvage as a condition of licensing. As so

---

such Act shall be substituted for the three complete fiscal year period in the provisions of this clause (i); and

(ii) during such additional period thereafter as, in the case of any river the report for which is submitted to the President and the Congress, is necessary for congressional consideration thereof or, in the case of any river recommended to the Secretary of the Interior for inclusion in the national wild and scenic rivers system under section 1273(a)(ii) of this title, is necessary for the Secretary's consideration thereof, which additional period, however, shall not exceed three years in the first case and one year in the second.

&ast; &ast; &ast; &ast; &ast; &ast;

(As amended Pub.L. 93–279, § 1(b)(3), (4), May 10, 1974, 88 Stat. 123; Pub.L. 93–621, § 1(c), Jan. 3, 1975, 88 Stat. 2096.)

**2.** Our conclusion that Congress intended the protections of section 1278(b) to apply only to those rivers listed in section 1276(a) finds support in the legislative history of the National Wild and Scenic Rivers Act. In the original House version of the Act it was contemplated that either a state or the Secretary of the Interior could conduct the required study of a river designated for potential inclusion in the national wild and scenic rivers system. Section 1278(b) protection against "adverse Federal agency action" was intended to apply to "the rivers listed in section [1276] which are being studied by a State" to the same extent as those being studied by the Secretary. H.R.Rep.No. 1623, 90th Cong., 2d Sess. 8 (1968), U.S.Code Cong. & Admin.News 1968, pp. 3801, 3808. While the provision allowing states to conduct studies on their own was modified in conference, H.R.Rep.No.1917, 90th Cong., 2d Sess. 16 (1968) (conference), this is another indication Congress intended section 1278(b) to apply only to rivers listed in section 1276(a). Of course, states may recommend rivers other than those listed in section 1276(a) for inclusion pursuant to section 1273(a)(ii). They are protected under section 1278(a), but only *after* being accepted by the Secretary.

modified, the order of the FPC is affirmed. The stay order by this court dated January 31, 1975 is vacated.

*Affirmed.*