547 F.2d 622
 9 ERC 1289, 178 U.S.App.D.C. 325, 6
Envtl. L. Rep. 20,599
 Nelson AESCHLIMAN et al., Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Consumers Power Co., a Michigan Corp., Intervenor.
SAGINAW VALLEY NUCLEAR STUDY GROUP et al., Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Consumers Power Company, Intervenor.
 Nos. 73-1776, 73-1867.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 27, 1974.
Decided July 21, 1976.
Certiorari Granted Feb. 22, 1977.
See 97 S.Ct. 1098.
 
 Myron M. Cherry, Chicago, Ill., with whom Robert L. Graham, Chicago, Ill., was on the brief for petitioners in No. 73-1867 argued for all petitioners.
 James L. Kelley, Atty., Nuclear Regulatory Commission, Washington, D. C., with whom Wallace H. Johnson, Asst. Attorney General, Marcus A. Rowden, Gen. Counsel, Nuclear Regulatory Commission, Raymond M. Zimmet, Assistant to the Solicitor, Nuclear Regulatory Commission. Edmund B. Clark, Jacques B. Gelin and Lawrence E. Shearer, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents.
 
 
 1
 Harold F. Reis, Washington, D. C., with whom J. A. Bouknight, Jr., Washington, D. C., was on the brief for intervenor Consumers Power Co.
 
 
 2
 Howard J. Vogel, St. Paul, Minn., was on the brief for petitioners in No. 73-1776.
 
 
 3
 William H. Ward, Wichita, Kan., filed a brief on behalf of the State of Kansas as amicus curiae urging reversal.
 
 
 4
 Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and JUSTICE,* United States District Judge for the Eastern District of Texas.
 
 
 5
 Opinion for the Court filed by Chief Judge BAZELON.
 
 BAZELON, Chief Judge:
 
 6
 These cases involve consolidated petitions for review of orders of the U.S. Atomic Energy Commission granting construction permits for two pressurized water nuclear reactors to generate electricity and steam.[1]
 
 
 7
 The applicant, Consumers Power Company (Consumers) made its initial application in January, 1969, under the Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2133, 2232, 2235, and 2239. Consumers' own system is the primary customer of electricity, while the adjacent facility of the Dow Chemical Company (Dow) was the intended customer of the output of process steam. Location of the twin reactors in Midland, Michigan, across the Tittabawassee River from Dow was dictated, in part, by the fact that steam does not efficiently retain heat over long travels.
 
 
 8
 Petitioner Aeschliman and five other residents of nearby Mapleton, Michigan, constituting the Mapleton Intervenors, opposed grant of the permits. Similarly in opposition were petitioning organizations, Saginaw Valley Nuclear Study Group, a local not-for-profit environmental organization, et al. (Saginaw).
 
 
 9
 As required by 42 U.S.C. §§ 2039, 2232(b), the application was referred to the Advisory Committee on Reactor Safeguards (ACRS), and to the Commission staff. In 1970, both ACRS and the staff preliminarily concluded that the facility comported with the Atomic Energy Act's public health and safety standards.
 
 
 10
 After notice and hearings,[2] a three-member Atomic Safety and Licensing Board issued a lengthy decision authorizing issuance of construction permits. Mapleton and Saginaw intervenors filed exceptions with the Atomic Safety and Licensing Appeal Board. Upon review, the Appeal Board affirmed in all respects, but attached conditions concerning the applicant's "quality assurance" program.[3]
 
 
 11
 Following the filing of petitions for review, motions seeking reconsideration on various grounds were made and denied.[4]I
 
 A.
 
 12
 Saginaw argues the Environmental Impact Statement (EIS) for construction of the Midland reactors did not adequately consider "alternatives to the proposed action" as required by §§ 102(C)(iii) and 102(D) of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4332(C)(iii); id., (D) (1970). In particular, Saginaw asserts the EIS was fatally defective for failure to examine energy conservation as an alternative to a plant of this size. The alternatives section of the EIS discusses several non-nuclear methods of power generation, but does not consider any measures for reducing consumer demand.[5] This omission was forcefully pointed out by Saginaw in its comments on the draft EIS.[6]
 
 
 13
 The Licensing Board rejected energy conservation alternatives as "beyond our province," stating the "real question" was which power generating technology would be superior.[7] On administrative appeal, the Licensing Board's decision not to explore conservation alternatives was affirmed. The Appeal Board held that conservation was implicitly considered in the cost-benefit analysis and demand projections, and that in view of Saginaw's failure to introduce evidence, further discussion was not required under the "rule of reason" enunciated in NRDC v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).[8]
 
 
 14
 Shortly after the Appeal Board decision, the Commission held in Niagara Mohawk Power Corp., RAI-73-11-995 (Nov. 6, 1973), that certain energy conservation issues should be considered in licensing proceedings. Saginaw thereupon appealed to the Commission for "clarification" of the Appeal Board's decision in light of Niagara. The Commission responded that before Licensing Boards need explore energy conservation alternatives, intervenors "must state clear and reasonably specific energy conservation contentions in a timely fashion. Beyond that, they have a burden of coming forward with some affirmative showing if they wish to have these novel contentions explored further." In re Consumers Power Co., RAI-74-1-19 at 32 (Jan. 24, 1974), I J.A. 71. The "affirmative showing" required was further elaborated as follows:
 
 
 15
 Purported energy conservation issues must meet a threshold test they must relate to some action, methods or developments that would, in their aggregate effect, curtail demand for electricity to a level at which the proposed facility would not be needed. . . . Beyond that, the issue must pertain to an alternative that is "reasonably available." Natural Resources Defense Council v. Morton, 458 F.2d 827, 834 (148 U.S.App.D.C. 5) (C.A.D.C.1972). (Footnote omitted.) Furthermore, the impact of proposed energy conservation alternatives on demand must be susceptible to a reasonable degree of proof. Largely speculative and remote possibilities need not be weighed against a convincing projection of demand. Here, as with many other issues under the National Environmental Policy Act of 1969, a rule of reason applies. See Natural Resources Defense Council v. Morton, supra.
 
 
 16
 Id., 24, I J.A. 63. Measured by these standards, the Commission held Saginaw's comments on energy conservation "fell far short."[9] Saginaw had introduced no evidence demonstrating the feasibility of particular methods of energy conservation, much less evidence indicating that the proposed facility could be eliminated entirely.[10]
 
 B.
 
 17
 Saginaw contends that the "threshold test" applied in this case is inconsistent with NEPA's "basic mandate" to the Commission to "take the initiative" in considering environmental issues. Calvert Cliffs' Coordinating Comm., Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1118-19 (1971). We agree.
 
 
 18
 In Calvert Cliffs the Commission proposed to limit consideration of environmental issues under NEPA to those "which parties affirmatively raise." Id., 1118. This court reversed, pointing out "it is unrealistic to assume that there will always be an intervenor with the information, energy, and money required" to investigate environmental issues. Id. The court held that the "primary responsibility" for fulfilling NEPA must lie with the Commission, which may not merely "sit back, like an umpire, and resolve adversary contentions at the hearing stage."[11] Id. See also Greene County Planning Board v. FPC, 455 F.2d 412, 420 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). The same considerations persuade us that the Commission may not refuse to consider energy conservation alternatives unless an intervenor first brings forward information satisfying the strictures of its "threshold test."The Commission derived the "threshold test" from the "rule of reason" courts use in reviewing the sufficiency of the alternatives considered in an EIS. NRDC v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 834 (1972). See also Carolina Environmental Study Group v. United States, 166 U.S.App.D.C. 416, 510 F.2d 796, 800-801 (1975); NRDC v. Callaway, 524 F.2d 79, 92 (2d Cir. 1975). Thus, for example, agencies are not required to consider alternatives which are "remote and speculative," Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), but may deal with circumstances "as they exist and are likely to exist." Carolina Environmental Study Group v. United States, supra, 510 F.2d at 801.
 
 
 19
 The Commission properly recognized that such judgments present mixed questions of law and fact which can only be intelligently resolved based on a factual record.[12] But the need to assemble data bearing on whether alternatives are promising enough to merit detailed consideration in the EIS does not mean the entire burden of compiling such information can be placed on the intervenors. In light of the allocation of responsibility established by Calvert Cliffs, we believe the Commission erred in promulgating a "threshold test" which essentially requires intervenors to prove an alternative satisfies the "rule of reason" before the Commission will investigate it.
 
 
 20
 In our view, an intervenor's comments on a draft EIS raising a colorable alternative not presently considered therein must only bring " sufficient attention to the issue to stimulate the Commission's consideration of it."[13] Thereafter, it is incumbent on the Commission to undertake its own preliminary investigation of the proffered alternative sufficient to reach a rational judgment whether it is worthy of detailed consideration in the EIS. Moreover, the Commission must explain the basis for each conclusion that further consideration of a suggested alternative is unwarranted. An explicit statement is essential to enable the parties to challenge the agency's action through motions for reconsideration, and to facilitate judicial review. The preliminary investigation of an alternative to determine whether it merits further consideration need not be nearly as detailed as that required regarding alternatives which are considered in the EIS. Often a short explanation will suffice.[14] It is not "onerous" for an agency, as well as a court, to state its reasons "if the matter was dealt with in a conscientious manner in passing on the merits." See Davis v. Clark, 131 U.S.App.D.C. 379, 404 F.2d 1356, 1358 (1968) (separate opinion of Tamm, J.).C.
 
 
 21
 In the instant case, Saginaw's comments were adequate to "stimulate the Commission's consideration" of energy conservation alternatives. Saginaw identified in a general way the measures it believed merited consideration, and their relationship to the objectives of the project. Of course, if energy conservation generally were already being considered in an EIS, more detailed comments might be required to focus the Commission's attention on specific techniques. See North Carolina v. FPC, supra note 6.
 
 
 22
 Energy conservation was clearly a "colorable" alternative relevant to the goals of the project. The FPC routinely requires that applications to build hydroelectric facilities include an environmental report discussing "the potential for accomplishing the proposed objectives through energy conservation" as well as through alternative energy sources. 18 C.F.R. App. A § 8.2 (1975), 38 Fed.Reg. 15946, 15949 (June 19, 1973). Moreover scholars and government officials are almost unanimous that energy conservation will have an important, although not decisive, role in overall energy policy in coming decades.[15] It follows that energy conservation was not to be dismissed by the Commission without inquiry or explanation.
 
 
 23
 Nor are we persuaded by the argument advanced by the Appeal Board that energy conservation was implicitly considered in the cost-benefit analysis or demand projections. See supra p. --- of 178 U.S.App.D.C., pp. 625-626 of 547 F.2d. In enacting §§ 102(C)(iii) and 102(D) of NEPA Congress required explicit consideration of "alternatives to the proposed action." Express consideration of other approaches to a problem places a proposed action in perspective for both the immediate decisionmaker and the public.[16]
 
 
 24
 We hold that rejection of energy conservation on the basis of the "threshold test" was capricious and arbitrary for the reasons heretofore stated. Remand for further proceedings on this and other issues discussed hereafter is therefore necessary.
 
 II
 A.
 
 25
 Saginaw also contends that the Commission erred by refusing to permit inquiry into the safety conclusions of the Advisory Committee on Reactor Safeguards (ACRS). ACRS is a group of outside experts charged by statute to "make reports . . . with regard to the hazards of proposed or existing reactor facilities and the adequacy of proposed reactor safety standards." 42 U.S.C. § 2039 (1970). See Siegel v. AEC, 130 U.S.App.D.C. 307, 400 F.2d 778, 780 (1968). Pursuant to 42 U.S.C. § 2232(b), each application for a construction permit or operating license for a commercial nuclear power generating facility must be reviewed by ACRS and a report "made . . . available to the public except to the extent that security classification prevents disclosure." Id.
 
 
 26
 The ACRS report in this case was a 5 page, single-spaced typewritten letter. In language accessible to the determined layman, the ACRS report discusses roughly half a dozen design problems raised by the Midland reactors, and recommends modifications to alleviate them.[17] Following discussion of these specific problems, the ACRS report concludes:
 
 
 27
 Other problems related to large water reactors have been identified by the Regulatory Staff and the ACRS and cited in previous ACRS reports. The Committee believes that resolution of these items should apply equally to the Midland Plant Units 1 & 2.
 
 
 28
 The Committee believes that the above items can be resolved during construction and that, if due consideration is given to these items, the nuclear units proposed for the Midland Plant can be constructed with reasonable assurance that they can be operated without undue risk to the health and safety of the public.
 
 
 29
 IV J.A. 97-98 (emphasis added).
 
 
 30
 Pointing out that it could not determine what "(o)ther problems" the ACRS had in mind, or what "resolution" of them it had suggested, Saginaw requested the Licensing Board to permit discovery into these matters. Saginaw's discovery requests took the form of 337 interrogatories, various document demands, subpoenas, and requests for depositions directed to ACRS members. These requests were all denied, for essentially two reasons. First, it was stated that "the ACRS letter is only admitted as part of the record to show compliance with the statutory requirements. . . ." RAI-74-5-331 at 340. Second, the Commission had indicated in another case that it would be inappropriate to probe the reasoning of individual ACRS members. Id., 340 & n. 62.
 
 
 31
 We agree with Saginaw that further explication of the ACRS report was necessary, but agree with the Commission that discovery from individual ACRS members was not the proper way to obtain it.
 
 B.
 
 32
 The role Congress intended for ACRS clearly emerges from its legislative history. In 1957, ACRS was added to the Atomic Energy Act of 1954 by Pub.L. 85-256, 71 Stat. 579. Prior to that time, the Commission had established its own "Committee on Reactor Safeguards." See S.Rep. No. 296, 85th Cong., 1st Sess., 1957 U.S.Code Cong. & Admin.News, pp. 1803, 1813 (hereafter USCCAN). However, in 1956, the Commission issued the construction permit litigated in Power Reactor Development Co. v. Int'l Union of Elect. Workers, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), despite an adverse committee report which had not been made public. See Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 499 F.2d 1069, 1073 n. 5, 1075 n. 13 (1974). Aroused by this incident, Congress gave ACRS an independent statutory existence and required that its reports be made public. Id.
 
 
 33
 The Commission opposed making a public ACRS report a "formal statutory requirement." USCCAN at 1816. However, noting the "great prestige" and credibility which the Reactor Safeguards Committee enjoyed in the eyes of the public, the Joint Committee on Atomic Energy stated:
 
 
 34
 The report of the (ACRS) committee is to be made public so that all concerned may be apprised of the safety or possible hazards of the facility. It is the belief of the Joint Committee that when the public is adequately and accurately informed that it will be in a better position to accept the construction of any reactors.
 
 
 35
 USCCAN 1825, 1826 (emphasis added). The statute established ACRS "as part of the administrative procedures in chapter 16 of the act" to provide the "same type of scrutiny and prestige" as the Reactor Safeguards Committee had in the past. USCCAN at 1825. As part of its mandate, ACRS also was to "advise the Commission with respect to the hazards involved at any facility" and to "insure that any features of new reactors would be as safe as possible." Id.
 
 
 36
 The ACRS report in this case must be evaluated in light of the congressional purposes. While the reference to "other problems" identified in previous ACRS reports may have been adequate to give the Commission the benefit of ACRS members' technical expertise, it fell short of performing the other equally important task which Congress gave ACRS: informing the public of the hazards. At a minimum, the ACRS report should have provided a short explanation, understandable to a layman, of the additional matters of concern to the committee, and a cross-reference to the previous reports in which those problems, and the measures proposed to solve them, were developed in more detail. Otherwise, a concerned citizen would be unable to determine, as Congress intended, what other difficulties might be lurking in the proposed reactor design. Since the ACRS report on its face did not comply with the requirements of the statute, we believe the Licensing Board should have returned it sua sponte to ACRS for further elaboration of the cryptic reference to "other problems."[18]
 
 
 37
 Turning to the propriety of discovery directed to individual ACRS members and ACRS documents, we conclude it was not error to deny these requests. ACRS' unique role as an independent "part of the administrative procedures in chapter 16 of the act," supra, is sufficiently analogous to that of an administrative decisionmaker to bring into play the rule that the "mental processes" of such a "collaborative instrumentalit(y) of justice" are not ordinarily subject to probing. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). This rule is particularly apropos in light of ACRS's collegialcomposition such that no individual may speak for the group as a whole. Where an ACRS report on its face omits material information, the appropriate course is not discovery but to return it for supplementation. Cf. Dunlop v. Bachowski, 421 U.S. 560, 574-75 & n. 11,95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). We merely hold here that neither the Atomic Energy Act nor general principles of administrative law required the Commission to grant Saginaw's discovery requests.[19]
 
 
 38
 On remand, the ACRS report should be returned to the ACRS for clarification of the ambiguities noted above.
 
 III
 
 39
 The fuel cycle issues in these cases are controlled by Natural Resources Defense Council v. United States Nuclear Regulatory Commission, 178 U.S.App.D.C. ----, 547 F.2d 633, Nos. 74-1385 & 74-1586 (Decided today). The final EIS prepared in regard to Midland plant units 1 & 2 says only that fuel wastes will be shipped to unidentified offsite disposal areas. On remand, the Commission shall undertake appropriate consideration of waste disposal and other unaddressed fuel cycle issues, and restrike the cost-benefit analysis, as necessary, in accordance with NRDC v. NRC, supra.
 
 
 40
 As this matter requires remand and reopening of the issues of energy conservation alternatives as well as recalculation of costs and benefits, we assume that the Commission will take into account the changed circumstances regarding Dow's need for process steam, and the intended continued operation of Dow's fossil-fuel generating facilities.[20]
 
 IV
 
 41
 Petitioners' other contentions must be rejected for lack of support in the record, or because prior decisions have concluded the issue unfavorably to petitioners.[21] The orders granting construction permits for the Midland reactors are hereby remanded for further proceedings in conformity with our opinion.
 
 
 42
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(d)
 
 
 [1]
 Under the Energy Reorganization Act of 1974, Pub.L. No. 93-438, 88 Stat. 1233, 42 U.S.C. § 5801 et seq. (Supp. IV, 1974), the licensing and related regulatory functions of the AEC were transferred to the U.S. Nuclear Regulatory Commission (NRC); the Energy Research and Development Administration (ERDA) assumed responsibility for the operation of government nuclear research and production facilities. 42 U.S.C. §§ 5814(c), 5841(f), 5842 (Supp. IV, 1974). We employ the term "Commission" to refer to both AEC and its regulatory successor, NRC
 
 
 [2]
 Seventeen days of hearings were held regarding health and safety issues. Dow and a local civic organization intervened on behalf of the application; the Mapleton and Saginaw intervenors opposed it. Under then-prevailing Commission rules, environmental issues did not have to be considered in a construction permit hearing, and were excluded. On the final day of hearings, this court decided Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971), striking down the Commission regulations governing treatment of NEPA issues. Thereafter, the Commission revised its environmental review regulations, and in January, 1972, issued its draft environmental impact statement on the Midland facility. Comments were solicited from federal agencies, groups in the vicinity of the proposed site, and the public. A final environmental impact statement followed in March, 1972. Fourteen days of public hearings on environmental issues were conducted in May and June, 1972. Saginaw did not participate in these latter hearings, but both Mapleton and Saginaw did submit proposed findings of fact and conclusions of law
 
 
 [3]
 The terms "quality assurance" and "quality control" are terms of art defined by 10 C.F.R., Part 50, App. B:
 "(Q)uality assurance" comprises all those planned and systematic actions necessary to provide adequate confidence that a structure, system, or component will perform satisfactorily in service. Quality assurance includes quality control, which comprises those quality assurance actions related to the physical characteristics of a material, structure, component, or system which provides a means to control the quality of the material, structure, component, or system to predetermined requirements.
 
 
 [4]
 These cases have been long delayed. The last decision on the merits by the Appeal Board was rendered May 18, 1973. On July 10, 1973, the Commission declined review. See 10 C.F.R. § 2.785(d)(1) (1975). The petitions for review were filed August 6, 1973. On November 6, 1973, the Commission declared a major change in policy regarding energy conservation. Niagara Mohawk Power Corp., RAI-73-11, 995. Petitioners sought clarification by the Commission of the impact of Niagara on parallel contentions in their case. This court delayed briefing to permit resolution of that question, and finally ordered the Commission to respond to petitioner's request. The Commission refused to reopen on January 24, 1974. Petitioners made a second motion before the Commission to reopen the matter on the ground that renegotiation of the Consumers-Dow agreement substantially altered elements of the cost-benefit analysis which had permitted construction. That motion was denied on February 5, 1974, and a third, which the Commission deems cumulative with the second, was denied on February 20, 1974. On April 11, 1974, after calling for all relevant contracts, the Commission again affirmed its decisions not to reopen for changed circumstances, noting that Dow still intended substantial takes of electricity and steam, and intended to maintain their fossil-fuel facilities, "primarily on a stand-by basis." These cases were argued together on November 27, 1974. On April 8, 1975, this court entered an order holding them in abeyance pending the decision in NRDC v. NRC, Nos. 74-1385, 74-1586, 178 U.S.App.D.C. ----, 547 F.2d 633 (decided today), which governs certain of the issues. See, infra III
 
 
 [5]
 III J.A. XI-1 XI-11
 
 
 [6]
 See, e. g., III J.A. 128, P 47 (promotional advertising); id., 129-30, P 48 (rate structure); see also id., 150 P 87 (air conditioner usage); id., 149, P 85 (generalized need to conserve energy resources)
 We need not decide what the result would be if energy conservation had not been brought to the Licensing Board's attention. We note, however, that several courts have considered intervenor's comments to be one factor bearing on the reasonableness of agency discussion of alternatives. Sierra Club v. Morton, 510 F.2d 813, 826 (5th Cir. 1975); North Carolina v. FPC, 174 U.S.App.D.C. 475 at 480, 533 F.2d 702, at 707 (1976), petition for cert. filed, 44 U.S.L.W. 3671 (U.S., May 14, 1976) (No. 75-1657). Cf. Maryland-Nat. Capital Park & Planning Comm. v. United States Postal Service, 159 U.S.App.D.C. 158, 487 F.2d 1029, 1040 n.9 (1973) (whether exhaustion doctrine applies to NEPA left open).
 
 
 [7]
 The Licensing Board wrote:
 
 
 [48]
 Intervenors have suggested at various times that the Board must go behind the characterization of "demand" made by the Applicant to determine whether an appropriate alternative to satisfying the demand would be to set limits on particular uses of electricity. The Board declines to do so. So far as appears from the record, the postulated demand is made up of normal industrial and residential use and it is, in our view, beyond our province to inquire into whether the customary uses being made of electricity in our society are "proper" or "improper". The suggestion was also made that Applicant is stimulating demand by its advertising. No evidence was offered on this point and absent some evidence that Applicant is creating abnormal demand, the Board did not consider the question
 II J.A. 38.
 
 
 [70]
 As noted above, the Board is satisfied that the benefits outweigh the costs. The real question comes with respect to alternatives. Assuming that the power needs are to be met, are there better alternatives? The evidence demonstrates that there are no hydro sites available, that a pumped storage facility would not meet the load needs, that gas is not a viable alternative for power use, and that outside sources are unavailable. (Citation omitted.) The question of alternatives is then boiled down to a choice between nuclear and fossil (either oil or coal) fuel at the proposed location or at some other location
 II J.A. 53-4.
 
 
 [8]
 The text of the Appeal Board's discussion of these issues was as follows:
 
 
 [3]
 Saginaw Intervenors . . . contend, in effect, that the Licensing Board should have considered . . . (inter alia ) the alternative of not constructing the plant at all . . . or embarking on a program to conserve energy; the environmental propriety of the proposed uses of electricity; and the alleged artificial stimulation by advertising of the demand for electricity
 a. Most of these effects and alternatives were in fact considered by the Board. . . . The alternative of not building the plant at all is inherently part of the cost-benefit analysis which was carried out by the Board. . . .
 Some of the intervenor's contentions in these exceptions seek to expand the NEPA review well beyond the pale of what we view as required by NEPA. Thus, while the scope of NEPA consideration of alternatives clearly extends beyond those which an agency itself may effectuate (see Natural Resources Defense Council v. Morton, (148 U.S.App.D.C. 5), 458 F.2d 827 (D.C.Cir. 1972)), a rule of reason nevertheless applies. Id. at 837. Contrary to intervenors' view, and giving effect to that rule, the Board was not required to analyze the use to which Consumers' customers might put the power generated by the Midland plant to ascertain whether that use would have an adverse environmental impact. The Board made a finding that the "postulated demand is made up of normal industrial and residential use" and that it need not inquire into the propriety of such customary uses of electricity. We agree.
 b. As for the contention that the demand for electricity was artificially stimulated by the applicant's advertising, the Board stated that no evidence had been offered to support that contention; and that absent some evidence that applicant was creating abnormal demand, it (the Board) would not consider the question. We do not believe the Board acted unreasonably.
 In re Consumers Power Co., ALAB-123, RAI-73-5-331 at 351-52 (May 18, 1973), I J.A. 38-39. (Footnotes and citations omitted.)
 Unfortunately, discussion of energy conservation by both Licensing and Appeal Boards was obscured by conflating two separate arguments advanced by the intervenors. In addition to arguing NEPA required consideration of energy conservation alternatives the intervenors argued that the alleged "benefits" of the plant should be discounted by the environmental harm which would be done by the products manufactured from the power generated. In particular, the intervenors focused on certain alleged carcinogens produced by the Dow Chemical Co., a large potential customer of the Midland plant. See, e. g., Saginaw Environmental Contentions P 34, III J.A. 118. This "end product" argument is not pressed on appeal.
 
 
 [9]
 Id., 32, I J.A. 71. The Commission does appear to have found one of Saginaw's contentions sufficient to raise an issue under Niagara. It related to possible revision of rates by state public utility commissions to discourage increased consumption of electricity. See id., 26-27, I J.A. 65-66. The Commission disposed of this point by declaring "we will not apply Niagara retroactively to cases which had progressed to final order and issuance of construction permits before Niagara was decided." Id
 Admittedly, agencies sometimes apply changes in their discretionary interpretations of their governing statutes only prospectively in order to avoid unfairness to those who have relied on prior pronouncements. See Retail Store Union v. NLRB, 151 U.S.App.D.C. 209, 466 F.2d 380, 390 (1972); NLRB v. Majestic Weaving Co., 355 F.2d 854, 860-61 (2d Cir. 1966). But that power cannot be stretched to permit disavowal of clear obligations a statute such as NEPA imposes on the agency itself. The Commission had no power to dispense with such consideration of energy conservation as NEPA required as of the time it was enacted in 1969, at least in those cases where the issue had been raised. See supra note 6.
 
 
 [10]
 Contrary to the Commission's formulation, an alternative cannot be ignored simply because it would not totally alleviate the need for a proposed facility:
 . . . Nor is it appropriate, as Government counsel argues, to disregard alternatives merely because they do not offer a complete solution to the problem. If an alternative would result in supplying only part of the energy that the (proposal) would yield, then its use might possibly reduce the scope of the . . . program and thus alleviate a significant portion of the environmental harm attendant on (it).
 NRDC v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). See also NRDC v. Callaway, 524 F.2d 79, 93 (2d Cir. 1975) (EIS must discuss "such alternatives to the proposed action as may partially or completely meet the proposal's goal") (emphasis added).
 It is sufficient that energy conservation might reduce projected demand for electricity so that a smaller facility, having lesser adverse environmental impact, would be adequate.
 
 
 [11]
 The Commission acknowledged in its opinion that "NEPA imposes upon us an affirmative obligation to develop an adequate record upon which to assess the environmental impact of proposed nuclear plants." RAI-74-1-19 at 31, I J.A. 70. However, the Commission felt it "must nevertheless have workable subsidiary rules for the orderly conduct of these proceedings." Id
 The Commission has substantial discretion in the selection of procedures. See Siegel v. AEC, 130 U.S.App.D.C. 307, 400 F.2d 778, 786 (1968). However, we do not believe the asserted interest in orderly proceedings goes so far as to justify the heavy substantive burdens placed on intervenors, contrary to Calvert Cliffs.
 
 
 [12]
 The decision that a technological or other development is a "realistic" alternative which merits full consideration in an EIS ought not turn on the intuition of "technically illiterate" judges that it is "reasonable." Cf. Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 541 F.2d ---- (1976) (en banc) (Bazelon, C. J., concurring). Nor, of course, should factual submissions bearing on the "reasonableness" of alternatives be presented to the court in the first instance. Cf. Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)
 
 
 [13]
 The phrase is drawn from our recent decision in Indiana & Michigan Elect. Co. v. FPC, 163 U.S.App.D.C. 334, 502 F.2d 336, 339 (1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975), a case concerned with the requirements of § 313(b) of the Federal Power Act, 16 U.S.C. § 825l (b) (1970), that objections be presented in an application for rehearing. The form of words used is not all important. The Commission's opinion in this case suggested a standard which would probably suffice as well: a "showing . . . sufficient to require reasonable minds to inquire further." RAI-74-1-19 at 32 n. 27, I J.A. 71. This does not, however, support the imposition of the burden of an affirmative evidentiary showing
 
 
 [14]
 A suggested alternative may be essentially redundant, or merely a minor variation of approaches already considered. Or preliminary investigation may indicate that it is impractical, or that meaningful information regarding it is not available
 Where the discussion of alternatives in an EIS is "sufficient to permit a reasoned choice," NRDC v. Morton, supra, 458 F.2d at 836, "an EIS does not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated." Brooks v. Coleman, 518 F.2d 17, 19 (9th Cir. 1975).
 
 
 [15]
 See, e. g., Nuclear Energy, Report of the 15th American Assembly (April 22-25, 1976), at 5. This three day symposium on the future of nuclear energy brought together 62 eminent participants from government, industry and the academic community under the auspices of Columbia University. The group reached a general consensus on the following conclusions, inter alia :
 
 
 [2]
 Although there was considerable sentiment that overall energy growth rate should be cut down through more efficient use and conservation of energy, it was felt that some growth, possibly as low as 1.5 percent, annually, but probably higher, would occur. For electric power demand, it was felt that although the growth rate would probably be less than the "historic" growth rate of 7 percent, it was unlikely to be less than 5 to 5.5 percent, in view of the need to substitute electrical energy for some present uses of oil and gas
 
 
 [3]
 Substantial savings can and should be made through energy efficiency improvements and a strong conservation program. Savings through voluntary action alone, although important, are likely to be limited. Some mandatory controls are essential, despite undoubted difficulties in administering such controls effectively and fairly. Market factors will have some impact, especially on commercial and industrial consumption, but they should be supplemented by tax and other incentives. In the case of individual consumption evidence to date suggests energy demands in the United States may not be strongly dependent on price in the short-run
 
 
 [16]
 Cf. EDF v. Corps. of Engineers (Tennessee-Tombigbee), 492 F.2d 1123 (5th Cir. 1974), in which the court rejected the suggestion that alternatives need not be considered where the environmental benefits of a project outweigh its costs. The court stated: "the congressional mandate to develop alternatives would be thwarted by ending the search for other possibilities at the first proposal which establishes an ecological plus, even if such a positive value could be demonstrated with some certainty." Id., 1135
 Demand projections based on historical growth rates are not an adequate substitute for explicit consideration of alternatives such as energy conservation. Cf. Carolina Environmental Study Group v. United States, supra. There petitioners argued the EIS should have discussed "at greater length the alternatives of no power, less power, and other means for power generation." 510 F.2d at 800. Although the court had already concluded "Duke's prior forecasts of future demand" had been extremely accurate, id., the court found it necessary to go on to examine the discussion of alternatives in the EIS, id., 801, and found it adequate under the "rule of reason" in the circumstances therein.
 
 
 [17]
 IV J.A. 93-98. Changes suggested by ACRS are almost always voluntarily adopted by the applicant. While ACRS approval (as opposed to scrutiny) is not required by law before a license issues, "in practice it is very unlikely that an applicant would persist in going before (the Licensing Board) over their objection." Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 499 F.2d 1069, 1073 n. 5 (1974)
 An example of the nature of the ACRS report is the following:
 The Committee has commented in previous reports on the development of systems to control the buildup of hydrogen in the containment which might follow in the unlikely event of a major accident. The applicant proposes to make use of a technique of purging through filters after a suitable time delay subsequent to the accident. However, the Committee recommends that the primary protection in this regard should utilize a hydrogen control method which keeps the hydrogen concentration within safe limits by means other than purging. The capability for purging should also be provided. The hydrogen control system and provisions for containment atmosphere mixing and sampling should have redundancy and instrumentation suitable for an engineered safety feature. The Committee wishes to be kept informed of the resolution of this matter.
 IV J.A. 97.
 A supplemental ACRS report was also prepared several months later addressing several additional problems. IV J.A. 99-100.
 
 
 [18]
 This is not to say that an ACRS report must contain detailed factual findings of the kind necessary to aid judicial review. Under Commission rules, when ACRS conclusions are controverted, a factual record is compiled anew before the Licensing Board. See 10 C.F.R., pt. 2, App. A, V(f)(1) (1976)
 
 
 [19]
 The case as presented calls upon the court to make no decision whether the Federal Advisory Committee Act, 5 U.S.C. App. I § 10(b) (Supp. III, 1973), entitles a party upon proper request to have access to data which were before the ACRS
 
 
 [20]
 This court has previously addressed factors to be considered in reanalysis of costs and benefits in the context of a derating license amendment calling for continued operation at a lower level:
 An alternative to be considered is complete abandonment of the project, just as it was at both the construction and full-power operating license stages. (citation to record omitted). As at those stages, sunk costs are not appropriately considered costs of abandonment, although replacement costs may be if construction of a substitute facility could reasonably be expected as a consequence of abandonment.
 Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 499 F.2d 1069, 1084 n. 37 (1974).
 
 
 [21]
 We conclude that the Appeal Board's treatment of the "quality assurance" and "quality control" requirements was adequate, and, particularly in light of the considerations and conditions set out in its orders, should not now be set aside
 The question of the propriety of using a generic rulemaking proceeding to determine standards governing Emergency Core Cooling Systems (for all like reactors) has been concluded unfavorably to petitioners by Union of Concerned Scientists v. AEC, 163 U.S.App.D.C. 64, 499 F.2d 1069 (1974).
 Mapleton Intervenors raise alleged weaknesses in the final EIS concerning data on the fogging and icing problems caused by the facility's proposed 880-acre cooling pond. Here, the Licensing Board directed, and the Appeal Board affirmed, I J.A. 47, applicant Consumers to conduct a study of fogging and icing in its required ecological surveillance program. The Commission is free to reassess this problem on remand, but it has received sufficient study that the court is not impelled to order that it be done.
 With respect to petitioners' complaint that inadequate attention has been given to the possibility of a Class 9 breach of containment or other accident, see Carolina Environmental Study Group v. United States, 166 U.S.App.D.C 416, 510 F.2d 796, 799-800 (1975); Ecology Action v. United States Atomic Energy Commission, 492 F.2d 998, 999 (2nd Cir. 1974).