598 F.2d 1221
 13 ERC 1243, 9 Envtl. L. Rep. 20,384
 SEACOAST ANTI-POLLUTION LEAGUE and Audubon Society of New
Hampshire, Petitioners,
v.
NUCLEAR REGULATORY COMMISSION and United States of America,
Respondents,
Public Service Company of New Hampshire et al., Intervenors.
 No. 78-1172.
 United States Court of Appeals,
First Circuit.
 Argued Oct. 6, 1978.
Decided May 30, 1979.
 
 Robert A. Backus, Manchester, N. H., with whom Lawrence R. Hott, and O'Neill, Backus & Spielman, Manchester, N. H., were on brief, for petitioners.
 Stephen S. Ostrach, Atty., U. S. Nuclear Regulatory Commission, Washington, D. C., with whom Peter R. Steenland, Jr., Chief, App. Section, James L. Kelley, Acting Gen. Counsel, Stephen F. Eilperin, Sol., and Jacques B. Gelin, Atty., App. Section, Land and Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., were on brief, for respondents.
 Thomas G. Dignan, Jr., Boston, Mass., with whom John A. Ritsher, R. K. Gad, III, and Ropes & Gray, Boston, Mass., were on brief, for intervenor, Public Service Company of New Hampshire.
 Harrison A. Fitch, Boston, Mass., on brief, for New Hampshire Voice of Energy, as amicus curiae.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 This petition for review of a decision of the Nuclear Regulatory Commission (NRC or "Commission"), 28 U.S.C. § 2342(4); 42 U.S.C. § 2239, questions whether the Commission's inquiry into possible alternative sites for the nuclear electric generating plant now being constructed at Seabrook, New Hampshire, was far ranging enough to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4361.
 
 
 2
 In 1973, the Public Service Company of New Hampshire and others (PSCO) initiated proceedings before the Nuclear Regulatory Commission to obtain permits to construct a nuclear facility with once-through cooling at Seabrook, a town in coastal New Hampshire.[1] Part of the agency process, which is outlined in our recent opinion in New England Coalition on Nuclear Pollution v. United States Nuclear Regulatory Commission, 582 F.2d 87, 93-96 (1st Cir. 1978), involved preparing a Final Environmental Statement (FES), which had to include a satisfactory statement on "alternatives to the proposed action." See National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E).[2] While examining alternatives has been called the "linchpin" of NEPA's mandate, Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 697-98 (2d Cir. 1972), there is no single rule for determining how many and what kinds of alternatives to study in a given case; as the Supreme Court stated in Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978), "Common sense . . . teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." At issue here is whether the Commission should have compared the site at Seabrook, on which PSCO sought permission to build, with more alternative sites than it did. The Commission and PSCO, joined by the New Hampshire Voice of Energy, insist that the number of sites investigated more than met the NRC's NEPA obligations. Petitioners Seacoast Anti-Pollution League and Audubon Society of New Hampshire deny this. They say, in particular, that the Commission evaded NEPA in terminating an inquiry launched in 1976 into certain southern New England sites which, though outside PSCO's own service area, are within the region that will receive power generated by the proposed nuclear facility.
 
 
 3
 In the decision under review here, the Commission ruled, by a 2-1 vote, that, assuming once-through cooling was allowed at Seabrook, a sufficient inquiry into alternate sites had been made and additional sites in southern New England need not be considered further. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), CLI-78-14, 7 N.R.C. (June 30, 1978). This decision was reached while the Environmental Protection Agency (EPA) was still considering PSCO's request for permission to use once-through cooling. The practical effect of the Commission's decision was to signal that the Seabrook plant could be completed if EPA allowed once-through cooling which, a month later, it did.[3]
 
 
 4
 The Commission's termination of the alternative sites inquiry came after approximately twenty-eight sites had been identified as possible alternatives to Seabrook. The Atomic Safety and Licensing Appeal Board (ALAB) had found that nineteen of these were not "obviously superior" to Seabrook with once-through cooling, apparently had considered six not to require in-depth study, and had asked the Commission to decide whether the remaining three should be investigated further.[4]
 
 
 5
 The Commission's decision emerged after a tortuous administrative history during which PSCO was allowed at times to proceed with construction at the Seabrook site even though the licensing process was incomplete. The tenor of the opinion, and of Commissioner Kennedy's and Bradford's separate opinions, illustrates that Seabrook's byzantine history has been a matter of concern to everyone; Commissioner Kennedy sees government bureaucracy as chiefly responsible for the on again-off again aspects of the proceeding; Commissioner Bradford, who would have required further examination of the southern sites, sees what has taken place as an object lesson in the dangers of building before an impartial NEPA survey is completed. The events preceding this decision under review may be recapitulated as follows:
 
 
 6
 In 1976 the Atomic Safety and Licensing Board (the Licensing Board) authorized the issuance of construction permits for a nuclear facility with once-through cooling at Seabrook, having found, Inter alia, that none of the nineteen alternative sites discussed in the FES was superior to Seabrook. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), LBP-76-26, 3 N.R.C. 857, 907-11 (1976). The FES had considered possible northern New England sites for the PSCO facility, including Seabrook and other sites on or near the New Hampshire and Maine seacoasts, two offshore sites, and six inland New Hampshire sites. A Draft Environmental Statement (DES) covering similar ground had been released for public comment in 1974. None of the comments filed during the comment period had suggested that the NRC consider additional alternative sites in southern New England. Only after the comment period had closed had the New England Coalition on Nuclear Pollution written two letters to the NRC staff, one urging that sites where units already existed be considered before turning to virgin sites, such as Seabrook, and the other suggesting an additional site in Maine as an alternative. Moreover, at the hearing before the Licensing Board, opponents of Seabrook had offered no witnesses or other evidence that the southern New England sites were better locations for a nuclear power plant they had merely attempted, in their cross-examination of various PSCO and NRC witnesses, to suggest that alternative sites should have been looked into further.
 
 
 7
 When the Licensing Board's decision went to ALAB on appeal, Seabrook's opponents contested the adequacy of the number of sites investigated and insisted that certain sites in southern New England should be considered. Meanwhile, before the appeal was argued, the EPA revoked its preliminary approval given sometime earlier of the use of once-through cooling at Seabrook.
 
 
 8
 Since the EPA's action raised the possibility that closed-cycle cooling would have to be substituted, ALAB halted construction at Seabrook, which had been allowed to commence after the Licensing Board's decision, and remanded the licensing proceeding for, Inter alia, a comparison of Seabrook with a closed-cycle cooling facility with the original alternative sites. It declined, however, to order consideration of the southern New England sites at that late stage. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), ALAB-366, 5 N.R.C. 39, 65 (1977). ALAB did not at that time review the Licensing Board's finding that none of the original alternative sites were superior to Seabrook with once-through cooling that issue was left for subsequent review, which occurred in July 1977, See Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), ALAB-422, 6 N.R.C. 33 (1977).
 
 
 9
 Reviewing ALAB's decision to remand the licensing proceedings, the Commission for the most part approved it, but ruled that sites in New England that already housed nuclear plants or where proposed plants had been postponed should be looked at in addition to the original nineteen sites in northern New England. It recognized that the record supported ALAB's determination that the possibility of the southern New England sites had not been raised in a timely fashion, but noted that some of the southern sites had been mentioned to the staff before the FES had been completed, and that the case was to be remanded in any event:
 
 
 10
 "Our necessarily limited review of the facts indicates that the Appeal Board majority's determination of untimeliness has support in the record. Normally, as Aeschliman (V. N.R.C., 178 U.S.App.D.C. 325, 547 F.2d 622 (D.C.Cir.1976), Rev'd sub nom., Vermont Yankee Nuclear Power Co. v. NRC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)) implies, 547 F.2d at 627-28, the stage at which intervenors must raise additional alternatives is the DES comment period. . . . The early opportunities afforded the public to participate in siting considerations . . . make appropriate what is in practical effect an increasing burden of justification for forcing consideration of new site alternatives. However, the fact is that this case must be remanded to the Licensing Board on other grounds for a new comparison of Seabrook with possible alternate sites, on the assumption of closed-cycle cooling. Nor is it clear what attention the Appeal Board panel gave the late-filed comments of NECNP. Although late in terms of filing, these comments may have been timely responses to developing circumstances. Our staff was in any event made aware of the more important of these shortly before publication of the FES. Our conclusion is that it would be improper to rely on timeliness grounds to exclude the issues raised by NECNP Regarding sites where units already exist, and sites where planned units have been postponed unless that suggestion can be shown to have been unreasonably delayed rather than a prompt response to developing events."
 
 
 11
 Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), CLI-77-8, 5 N.R.C. 503, 539 (1977) (emphasis added; footnote and some citations omitted). The Commission also ruled that the actual completion costs of the Seabrook facility should be considered in comparing it to the costs of building on other possible sites, 5 N.R.C. at 530-36, and that other sites would have to be shown to be "obviously superior" for the Seabrook site to be rejected, 5 N.R.C. at 526-30. Since then, we have held that these "sunk costs" and "obviously superior" standards do not Per se violate NEPA by impermissibly skewing the comparison in favor of the applicant's proposed site. New England Coalition, supra, 582 F.2d 87.
 
 
 12
 In July, 1977 four months after the Commission's decision ALAB finally reviewed the Licensing Board's 1976 comparison of Seabrook as a site for a facility with once-through cooling with the original alternative sites. It found flaws in the Licensing Board's reasoning but, after an independent review of the record, held that none of the alternative sites were "obviously superior" to Seabrook. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), ALAB-422, 6 N.R.C. 33, 65-72 (1977) (hereinafter ALAB-422). This aspect of ALAB-422 became the final decision of the agency and, as it was not reviewed by this court when other aspects of ALAB-422 were before us last year,[5] it stood uncontroverted until the present appeal was brought.
 
 
 13
 The Licensing Board's comparison of the Seabrook site with a once-through cooling facility with the southern New England sites reached ALAB for review almost a year later in April 1978.[6] A majority of ALAB concluded that the record neither supported the Licensing Board's finding that none of the southern sites was "obviously superior" nor allowed ALAB to reach this conclusion independently. Preliminary to setting forth its reasoning, however, ALAB expressed some doubt as to whether the sites warranted consideration any longer. Two members of the panel thought that the Commission might have ordered consideration of the southern New England sites in March 1977 because of the District of Columbia Circuit's decision in Aeschliman v. N.R.C., 178 U.S.App.D.C. 325, 547 F.2d 622 (1976), Rev'd sub nom., Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Aeschliman, in ALAB's words, had held that,
 
 
 14
 "if an intervenor's comments on the draft environmental statement raise a 'colorable alternative not presently considered therein' in a manner which brings 'sufficient attention to the issue to stimulate the Commission's consideration of it', the Commission must 'undertake its own preliminary investigation of the proffered alternative sufficient to reach a rational judgment whether it is worthy of detailed consideration in the' Final Environmental Statement."
 
 
 15
 ALAB-471, slip op. at 15; See 178 U.S.App.D.C. at 331, 547 F.2d at 628. This, ALAB suggested, had rejected the Commission's "threshold test," which required that the intervenor make a preliminary affirmative showing "sufficient to require reasonable minds to inquire further." ALAB-471, slip op. at 16. The threshold test had been expressly approved by the Supreme Court, however, when it reversed the District of Columbia Circuit in April 1978. Id. ; See 435 U.S. at 549-51, 98 S.Ct. 1197.
 
 
 16
 Uncertain as to whether Aeschliman had influenced the Commission, ALAB said that it would, "leave it to the Commission to provide the answer to whether, in light of the Supreme Court's recent action, it still regards the southern New England site inquiry to be an appropriate one." ALAB-471, slip op. at 19. Rather than postpone its review of the Licensing Board's decision until the Commission had spoken, however, ALAB chose to proceed to the merits both to save time and because the appeal involved issues beyond the southern sites inquiry.
 
 
 17
 The Licensing Board had rejected the southern sites on a generic basis, and had concluded that " 'an individual comparison of Seabrook with one or more of (the nine) sites is unnecessary' because of 'the institutional and legal obstacles and the economic disadvantages associated with (those) sites as well as the uncontroverted superiority of the Seabrook location for system reliability.' " ALAB-471, slip op. at 21, Quoting 6 N.R.C. at 139. ALAB found the Board's underlying findings "patently insufficient justification for the Board's result." ALAB-471, slip op. at 22. Some of the Board's findings had no support in the record and others were insufficient to support its ultimate conclusion:
 
 
 18
 "(T)he decision below falls well short of establishing the existence of generic factors which . . . would 'make consideration of any existing or planned unit sites (in southern New England) 'unreasonable' and consequently render unnecessary a NEPA comparison of Seabrook with specific sites."
 
 
 19
 ALAB-471, slip op. at 25.
 
 
 20
 When ALAB undertook an independent site-by-site analysis, it concluded that the record did not enable it to find that the three sites that appeared to be the strongest alternatives to Seabrook Millstone, Pilgrim and Montague were not "obviously superior" to Seabrook. Neither was there sufficient evidence, however, to find that any one of these three sites Was "obviously superior" to Seabrook. The proceedings would have to be remanded for further consideration of "at least" Millstone, Pilgrim, and Montague:
 
 
 21
 "(W)e are compelled to hold that neither the findings contained in the July 7 supplemental initial decision nor the record on which those findings were based supports the Licensing Board's conclusion that, because of generic factors, none of the southern New England sites it considered is 'obviously superior' to the Seabrook site. Although it is equally true that the findings and record do not demonstrate that one of those sites Is 'obviously superior', that consideration is of no aid to the applicants. If . . . reasons exist which would serve to rule out southern New England sites generically, the applicants had the burden to put forth an adequate evidentiary showing on them. As the applicants did not successfully discharge that burden, it was incumbent upon them (in conjunction with the staff) to put before the Licensing Board information sufficient to enable an informed individual comparison of the Seabrook site with at least Millstone, Pilgrim and Montague the three sites in southern New England appearing to have the greatest potential as alternatives to Seabrook. This obligation also not having been satisfactorily fulfilled, the Licensing Board's decision must be reversed and the cause remanded for further proceedings." 25
 
 
 22
 ALAB-471, slip op. at 37. In footnote 25, ALAB reiterated that it was making this order on the premise that the Commission would not choose to terminate the southern New England sites inquiry because of Vermont Yankee.
 
 
 23
 The Commission, faced with the question, did choose to terminate the comparison of the southern New England sites with Seabrook operating with once-through cooling. Side-stepping ALAB's query as to the impact of Vermont Yankee on its thinking, it focused on the fact that, since the time that it had ordered the southern New England sites inquiry, ALAB had upheld the Licensing Board's June 1976 holding that none of the original alternative sites was superior to Seabrook, assuming a facility at Seabrook could be built with once-through cooling. The Commission concluded that, if none of the original sites could meet the "obviously superior" test, the chance that any of the southern New England sites would meet that test was too remote to warrant further inquiry:
 
 
 24
 "Since (March 1977) . . . the Appeal Board in ALAB-422 has found, based on its reanalysis of the record, that none of (the eighteen sites) is 'obviously superior' to Seabrook with once-through cooling. We believe that as a practical matter, the likelihood that one of the three southern sites will succeed in meeting the 'obviously superior' test, where 18 other sites have failed to do so, is not sufficient to justify a further inquiry on this point. Our view is bolstered by the undisputed assertion of the applicant that Seabrook with once-through cooling enjoys cost advantages over other sites much greater than the difference in cost between Seabrook with closed-cycle cooling and alternative sites . . . ."
 
 
 25
 CLI-78-14, slip op. at 4-5.
 
 I.
 
 26
 In attacking the Commission's decision to terminate the southern New England sites inquiry, petitioners define the issue before us as "simply whether the Commission has met its NEPA obligations to 'study, develop and describe available alternatives.' " See 42 U.S.C. § 4332(2). They argue that, by terminating the southern New England sites inquiry as it did, the Commission impermissibly limited the alternative sites inquiry to the original sites (including Seabrook) considered in the FES all of which were within PSCO's service area. Given the size and scope of the proposed project, they would have us require consideration of sites outside that area I. e., sites in southern New England. Second, they argue that the Commission's decision cannot withstand reasoned analysis, as it makes questionable assumptions and draws illogical conclusions as to the relative merits of the northern and southern New England sites in comparison with Seabrook. Finally and in further support of their second argument they assert that the original alternative sites were "straw men" that were never examined as rigorously and in such detail as NEPA would require. Taking this as true, they argue that the Commission was not entitled to conclude that further investigation of the southern sites would be fruitless on the ground that eighteen sites had already failed to pass the "obviously superior" test.
 
 II.
 
 27
 Turning first to petitioners' final point, that the original nineteen sites were not studied in sufficient depth, that question is no longer open for review. Determination that the original alternative sites were not "obviously superior" to Seabrook with once-through cooling was made by ALAB in July of 1977, when it affirmed the Licensing Board's issuance of construction permits to Seabrook, ALAB-422, 6 N.R.C. 33 (1977). As indicated previously, that aspect of ALAB-422 became the final decision of the agency and, when aspects of ALAB-422 and CLI-77-8, 5 N.R.C. 503 (1977), were reviewed by this court in 1978, the validity of ALAB's decision as to the original sites was not questioned. See New England Coalition, 582 F.2d 87. Any challenges to the adequacy of the investigation of the eighteen alternative sites with once-through cooling should have been raised then. We decline to consider the matter now.
 
 
 28
 For similar reasons, petitioners' challenge to the scope of the alternative sites inquiry must be restricted to the nine sites considered by the Licensing Board and ALAB on remand from the Commission. The Commission's order that the southern sites be considered clearly applied only to "sites where units already exist, and sites where planned units have been postponed." CLI-77-8, 5 N.R.C. at 539. The nine sites considered on remand were the only sites within the ambit of this description. If the petitioners were dissatisfied with the scope of the Commission's order, they should have challenged it when other aspects of the order were before us last year in New England Coalition, 582 F.2d 87.
 
 
 29
 The question before us is thus whether the Commission violated its NEPA obligations when it decided to terminate the inquiry into the nine southern New England sites as alternatives for a facility with once-through cooling, when eighteen northern New England sites (and, arguably, six of the additional sites[7]) had proven not to be "obviously superior" alternatives. We find that it has not.
 
 III.
 
 30
 The Supreme Court has recently discussed the standards that guide courts in determining if the Commission has met its duty under NEPA to explore alternatives. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). In that case the Court reversed the D.C. Circuit's ruling that the NRC was derelict in not considering energy conservation as an alternative to authorizing a nuclear power plant.
 
 
 31
 In Vermont Yankee the lower court had laid down the principle that when an intervenor's comments "bring 'sufficient, attention to the issue to stimulate the Commission's consideration of it,' " the Commission has no choice but to undertake a preliminary investigation of the proffered alternative and to explain the basis for any conclusion that further consideration of the alternative is unwarranted. 435 U.S. at 550, 98 S.Ct. at 1215, Quoting 547 F.2d at 628. Terming this rationale a basic misconception of "the nature of the administrative process," the Supreme Court pointed out that primary decisions on the need for power are vested in state public utility commissions, whereas the Commission's "prime area of concern in the licensing context . . . is (national security,) public health, and safety." 435 U.S. at 550, 98 S.Ct. at 1215. While the NEPA requirement for a statement of alternatives "altered slightly the statutory balance," the term "alternatives" is not self-defining and "must be bounded by some notion of feasibility." Id. at 551, 98 S.Ct. at 1215. NEPA does not require discussion of the environmental effects of alternatives when those effects cannot be ascertained readily, and when the alternatives are only remote and speculative possibilities that cannot be meaningfully explored within the time-frame of the needs to which the underlying proposal is addressed. See id.
 
 
 32
 The Court emphasized further that the agency need not "ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." Id. The agency's duty must rather be judged in light of information then available to it:
 
 
 33
 "We think these facts amply demonstrate that the concept of 'alternatives' is an evolving one, requiring the agency to explore more or fewer alternatives as they become better known and understood."
 
 
 34
 Id. at 552-53, 98 S.Ct. at 1216.
 
 
 35
 The Court also stressed that intervenors have a duty "to structure their participation so that it is meaningful, so that it alerts the agency to (their) position and contentions. This is especially true when the intervenors are requesting the agency to embark upon an exploration of uncharted territory . . . ." Id. at 553, 98 S.Ct. at 1216. It said,
 
 
 36
 "Indeed, administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated . . . ."
 
 
 37
 Id. at 554, 98 S.Ct. at 1217. The Supreme Court concluded its discussion of alternatives by rehabilitating the Commission's "threshold test," which the D.C. Circuit had struck down. The Court said,
 
 
 38
 "We have also made it clear that the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review."
 
 
 39
 Id. at 555, 98 S.Ct. at 1217.
 
 IV.
 
 40
 We have outlined the discussion of alternatives in Vermont Yankee because we believe much of it is germane here. To be sure, we are not presently reviewing the Commission's refusal to study an alternative, but rather its refusal to continue with an inquiry already begun. But in determining whether the Commission could, in its discretion, abandon the southern sites study, we think it relevant whether it was obliged to embark on the study initially. We think it also relevant that petitioners have in these proceedings played dog in the manger with respect to alerting the agency to reasons why the southern sites might be advantageous locations for the proposed nuclear plant. Finally, the failure of the record to show that these sites have more than remote and speculative advantages over Seabrook persuades us that the Commission did not abuse its powers in terminating the inquiry.
 
 
 41
 A. The Commission was not compelled to undertake the southern sites inquiry.
 
 
 42
 As the Court acknowledged in Vermont Yankee, "NEPA places upon an agency the obligation to consider every Significant aspect of the environmental impact of a proposed action . . . ." Id. at 553, 98 S.Ct. at 1216 (emphasis supplied). In respect to alternatives, an agency must on its own initiative study all alternatives that appear reasonable and appropriate for study at the time, and must also look into other significant alternatives that are called to its attention by other agencies, or by the public during the comment period afforded for that purpose. As the Court went on to say, however, the process of studying alternatives is not endless. The administrative process has to have structured time limits, lest decisions never be reached:
 
 
 43
 "If upon the coming down of the (agency's) order litigants might demand rehearing as a matter of law because some new circumstances have arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated . . . ."
 
 
 44
 Id. at 554-55, 98 S.Ct. at 1217, Quoting Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 514, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944).
 
 
 45
 In the present licensing proceeding, the Commission staff studied numerous sites other than Seabrook, all within PSCO's service area, and it was not until after the comment period had closed that any suggestion of the southern sites as possible alternatives was made. Especially as these were remote from PSCO's service area, they were not of such obvious significance that the Commission was required, at its peril, to consider them on its own initiative. There was, therefore, much justification for ALAB's initial refusal, on grounds of untimeliness, to look into these sites at all. The Commission itself observed, when the matter came before it, that,
 
 
 46
 "The early opportunities afforded the public to participate in siting considerations . . . make appropriate what is in practical effect an increasing burden of justification for forcing consideration of new site alternatives."
 
 
 47
 Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), CLI-77-8, 5 N.R.C. 503, 539 (1977). Thus, when the Commission elected to order the staff to look into the southern sites, it indicated that it was doing so largely because of special circumstances then existing. One of these circumstances was that a remand was required in any event to review the siting issue in light of a possible switch to closed-cycle cooling. Another apparently was uncertainty whether, under the since discredited Aeschliman decision, 547 F.2d 622, untimeliness was a sufficient excuse. Thus the southern sites study appears to have been launched less because of the Commission's perception of its merits than because it could be accommodated without disruption and was, in any event, politic under Aeschliman.
 
 
 48
 By 1978 both premises were outmoded. The belated inquiry could no longer be accommodated without threat of serious delay, and Aeschliman was no longer the law. We believe these circumstances are relevant in weighing the burden of the Commission's later duty to continue with the study. Had the study been initiated earlier on a firmer basis, it might have been improper for the Commission to have short-circuited its own normal administrative procedures. But, while the Commission could not terminate the eleventh-hour study capriciously, it could do so for good reason. Certainly among the reasons supporting the Commission's action were the facts that, assuming once-through cooling could be used, its original gratuitous decision to undertake the southern sites inquiry had become the sole obstacle to completion of the much-delayed licensing process, and that Aeschliman had been reversed. We do not suggest that these reasons alone would be enough. If environmental issues of moment had been unearthed since the southern sites review began, our conclusion would be different. But, as indicated below, we think the prospect of any benefit from continued study of the southern sites was too remote and speculative to have required the Commission to go forward with a study which it need never have undertaken.
 
 
 49
 B. Petitioners have failed to structure meaningfully their participation in the southern sites investigation.
 
 
 50
 Vermont Yankee makes it clear that the NEPA requirement of studying alternatives may not be turned into a game to be played by persons who for whatever reasons and with whatever depth of conviction are chiefly interested in scuttling a particular project. There would be no end to the alternatives that might be proposed if opponents had no obligation to do more than make a facially plausible suggestion that a particular alternative might be of interest, and could then, after awaiting the results, find reasons why the agency's survey was inadequate. The agency bears the primary responsibility to investigate serious alternatives, but reviewing courts, when weighing objections based on an alleged failure to study alternatives, properly may consider the extent and sincerity of the opponents' participation.
 
 
 51
 Here, the licensing proceeding began in 1973; no mention of the southern sites was made during the DES comment period in 1974, but in 1977 the Commission agreed to include the southern sites in its investigation on remand. At that point four years into the proceeding petitioners were not free to stand aside and leave the investigation entirely to the NRC staff and PSCO, subject to petitioners' later criticism. See Vermont Yankee, 435 U.S. at 553-54, 98 S.Ct. 1197. Petitioners were at least obligated to put something tangible before the agency to support the view that Millstone, Montague or Pilgrim might, from an environmental viewpoint to say nothing of safety or economy, enjoy a substantial measure of superiority over Seabrook as the site of a nuclear power plant. Their inability or unwillingness to do so is starkly reflected in their brief submitted to this court. As to Pilgrim, they note that it is not in a picturesque salt marsh, that local inhabitants once voted to accept new reactors, and that the EPA official who originally disapproved once-through cooling at Seabrook approved it at Pilgrim. Otherwise they do no more than advance the general proposition that the southern sites are already dedicated to nuclear power. They point to no evidence that any of the southern sites would prove, on further investigation, to meet the "obviously superior" standard adopted for the southern sites inquiry. ALAB's chairman himself noted, in the same opinion holding the record inadequate to support a finding that Pilgrim, Millstone and Montague were Not obviously superior, that petitioners had failed to participate in any meaningful way on remand. ALAB-471, slip op. at 19.
 
 
 52
 Petitioners' castigation of the agency for its failure to develop reasons supporting the three sites cannot but ring somewhat hollow, when they have been so singularly lacking in specifics themselves. If one of the three sites was a feasible and obviously superior alternative to Seabrook, petitioners, given the opportunity as they were, should have been able to present some supporting material. While petitioners' failure "to structure their participation so that it is meaningful," Vermont Yankee, 435 U.S. at 553, 98 S.Ct. at 1216, does not release the Commission from its basic NEPA obligations, it does limit the extent to which petitioners can expect the agency to carry its investigation to the furthest limits.[8]C. The advantages of the southern sites were too speculative to have required the Commission to proceed.
 
 
 53
 The ultimate question remains whether termination of the southern sites inquiry was reasonable in light of the Commission's statutory responsibilities, including but not limited to NEPA. These include responsibility to conduct a workable licensing process, with due concern for public health and safety, on the one hand, and for national and local economic and energy needs on the other. As indicated, considerations of fairness and of sheer practicality entitled the Commission to take into account, in terminating the study, its eleventh-hour beginnings, its burdensome effects, and petitioners' lack of meaningful participation. But these reasons would not be enough if information so far developed would compel reasonable minds to go forward under existing circumstances. The Commission plainly felt not and, given the measures of deference a reviewing court must accord, we cannot say that its judgment was arbitrary.
 
 
 54
 In support of this conclusion, we rely first on the nature of ALAB's disapproval of the Licensing Board inquiry into the southern sites. ALAB held that the applicants and staff did not discharge their burden "to enable an informed individual comparison of the Seabrook site with at least Millstone, Pilgrim and Montague the three sites in southern New England appearing to have the greatest potential as alternatives to Seabrook." ALAB-471, slip op. at 37. ALAB made it clear, however, that nothing before it demonstrated the "obvious superiority" of those sites rather the trouble lay in the applicants' and staff's failure to meet their burden of demonstrating the opposite. It is significant that ALAB suggested at this time that, in light of the Vermont Yankee holding, the Commission might want to terminate the southern sites inquiry altogether a suggestion incompatible with any perception that the investigation was likely to prove fruitful.
 
 
 55
 In terminating the study, the Commission relied on the fact that eighteen other sites had been investigated and were not "obviously superior." It also relied on the "undisputed" assertion of applicants that Seabrook with once-through cooling enjoys cost advantages over other sites much greater than the difference in cost between Seabrook with closed-cycle cooling and alternative sites.
 
 
 56
 The fact that the staff had studied numerous other alternative sites, although not dispositive, is supportive. To the extent NEPA mandates study not only of alternative Uses of an applicant's proposed site, but also of alternative sites (a question we need not attempt to decide), the fact that the agency sampled a fair number of alternative sites establishes a measure of NEPA compliance. Alternative sites cannot be studied Ad infinitum, and the fact that a sampling of sites has been found not to be superior affords some basis for believing that other sites will fare no better. This implication carries us only so far, however. Appellants contend the southern sites are distinguishable as they are all sites on which nuclear plants already exist or are planned. Building on them, it is argued, will avoid the need to dedicate a virgin site to nuclear uses, will preserve, in Seabrook's case (were it not partially built) the natural environs, and will avoid any adverse effects on marine life in that locale caused by the cooling system.
 
 
 57
 While petitioners' contentions are interesting, they are too speculative to have required the Commission to continue the southern sites study at this late stage. First, they are wholly theoretical. Nothing in the record before us demonstrates that the New England environment would benefit significantly if the PSCO plant were located in southern New England rather than at Seabrook.[9] No reasoned analysis, even of a preliminary sort, has been presented showing that the environmental advantages of avoiding a site like Seabrook would offset the environmental deficits that necessarily would be associated with building a second nuclear facility at one of the southern sites. Many questions would have to be addressed to make such a position meaningful. These range from the feasibility, safety and general acceptability of siting two nuclear reactors in one community to whether such an arrangement, involving a site outside New Hampshire, could satisfy the power needs Seabrook seeks to satisfy, at a reasonable cost. There would also be knotty questions of policy and law concerning the degree to which proceedings seeking a license for a site controlled by the applicant should be turned into proceedings focusing on sites beyond the applicant's immediate control and wishes. Petitioners concede there may be problems, but say, in effect, "You can't tell how serious they are until you take a look." Given the course of these proceedings and the ample opportunity petitioners have had to present their case, this response is too feeble. As Vermont Yankee teaches, alternatives may be so remote and speculative, and so incompatible with the time-frame of the needs to be met by the underlying proposal, as to be beyond NEPA's mandate. 435 U.S. at 551, 98 S.Ct. 1197. We do not believe there is enough indication that the southern sites comparison would significantly affect the project under consideration for us to override the Commission's judgment in the matter. Id. at 555, 98 S.Ct. 1197.[10]
 
 
 58
 Petition for review dismissed.
 
 
 
 [1]
 The proposed once-through cooling system utilizes water drawn directly from the nearby ocean. A different kind of cooling closed-cycle (involving cooling towers) would have to be constructed were once-through cooling not used. Closed-cycle cooling would require an entirely different design than the one developed by PSCO for the Seabrook facility, and would pose a different mix of environmental and siting considerations
 
 
 [2]
 NEPA provides that all federal agencies shall, "to the fullest extent possible,"
 "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, A detailed statement by the responsible official On . . . Alternatives to the proposed action,"
 42 U.S.C. § 4332(2)(C)(iii) (emphasis added), and again "to the fullest extent possible" shall,
 "Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources,"
 42 U.S.C. § 4332(2)(E) (emphasis added).
 
 
 [3]
 On August 4, 1978, the EPA reaffirmed its earlier approval, which we had reversed and remanded in Seacoast Anti-Pollution League v. Costle, 572 F.2d 872 (1st Cir. 1978), of the use of once-through cooling at Seabrook. As a result, the Commission on August 9 lifted the suspension of PSCO's construction permits that had been in effect since shortly after our decision in Costle. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), Commission Memorandum and Order (Aug. 9, 1978)
 
 
 [4]
 Nineteen alternative sites were found not to be "obviously superior" to Seabrook by ALAB in 1977. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), ALAB-422, 6 N.R.C. 33, 65-72 (1977). Nine additional sites were within the scope of the Commission's remand order of March, 1977. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), CLI-77-8, 5 N.R.C. 503 (1977). When the investigation on remand reached ALAB in April 1978, it did not discuss individually five of the nine sites. It dismissed one site as unavailable, and focused on Pilgrim, Millstone and Montague. It ruled that the evidence was not sufficient to support a conclusion that these three sites were not "obviously superior" to Seabrook and that the PSCO and the NRC staff should have an opportunity to introduce such evidence on remand, if the Commission ordered the inquiry continued. Public Service Company of New Hampshire (Seabrook Station, Units 1 & 2), ALAB-471, 7 N.R.C. 477 (1978)
 
 
 [5]
 Other aspects of ALAB-422 were before us, joined with the appeal from CLI-77-8, in New England Coalition on Nuclear Pollution v. N.R.C., 582 F.2d 87 (1st Cir. 1978)
 
 
 [6]
 The comparison of Seabrook with both the original sites and the southern sites on the assumption of closed-cycle cooling was also before ALAB, but this part of its decision does not concern us here
 
 
 [7]
 See note 4, Supra
 
 
 [8]
 The petitioners' unstructured approach to this litigation is illustrated by the fact that, six months after oral argument before this court, they asked us to consider, without the benefit of any prior agency interpretation, the significance of NRC Regulatory Guide 4.7, which states that the agency will give special attention to alternate sites when the population density around a proposed site exceeds certain figures. Petitioners contend that the projected population density around Seabrook exceeds these figures and that that around Plymouth the Pilgrim site does not. This information, which bears only on one factor and on one alternate site where a nuclear facility already exists, is precisely the kind of information that by itself is meaningless and that we would need the agency's expertise to interpret. The same is true of the Regulatory Guide itself. We can do no more than note that it is a guide for identifying suitable sites at the initial stage of the license application process and that it points to no specific substantive result, but merely to a perhaps broader and more careful investigation of alternate sites than usual. The investigation of the alternate sites in the Seabrook proceedings is by no means necessarily inconsistent with this policy. Even accepting petitioners' assertion that they learned of this Guide only recently, despite its publication in 1974, petitioners had an obligation to raise this matter with the agency itself. See Fed.R.App.P. 16; Bangor & Aroostook Railroad Co. v. ICC, 574 F.2d 1096, 1114 (1st Cir. 1978); K. Davis, Administrative Law Treatise § 20.06 (1958; 1970 Supp.)
 
 
 [9]
 The issue here is not whether to proceed with nuclear power development but whether to study further the location of a particular plant. Placing the plant in one place rather than another will always have significant environmental advantages from the perspective of those who are spared the presence, in their region, of a plant they oppose. But we do not think this shifting of burdens, as between otherwise comparable sites, warrants an environmental study. If it did, such studies would be never-ending. The question is always whether there is a significant Net environmental advantage if the plant is placed in one rather than the other spot
 
 
 [10]
 We distinguished in New England Coalition between the agency's right to use "sunk cost" standards for site comparison, and its NEPA duty to take a "hard look" at alternatives. 582 F.2d at 96. That distinction remains valid and important; for example, if it reasonably appeared when the Commission acted to terminate the study that a comparison between Seabrook and the southern sites would resolve vital issues of public health, safety or environmental pollution relevant to the Seabrook project, the financial investment in Seabrook would not justify a refusal to continue the study. Here, however, there is only speculation to suggest that any of the southern sites would have significant advantages over Seabrook, even assuming that such a site would become available and would otherwise be feasible for construction of a second nuclear power plant. On this record and in these circumstances, we do not think the Commission's judgment to curtail the southern sites inquiry was so arbitrary, nor so obviously violative of NEPA principles, as to be grounds for reversal